**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| Jaiden Buchan | : | |
| 345 W. Chocolate Avenue | : | |
| Hershey, Pennsylvania 17033 | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| The Milton Hershey School | : | NO.: |
| 711 Crest Lane | : | |
| Hershey, Pennsylvania 17033 | : | |
| | : | |
| And | : | |
| | : | |
| The Hershey Trust Company, as Trustee | : | |
| Of the The Milton Hershey School Trust | : | |
| 100 Mansion Road East | : | |
| Hershey, Pennsylvania 17033-044 | : | |
| | : | |
| And | : | **JURY TRIAL DEMANDED** |
| | : | |
| John Does 1-10 | : | |
| | : | |
| Defendants. | : | |

## CIVIL ACTION COMPLAINT

Plaintiff, Jaiden Buchan ("Jaiden"), by and through her undersigned attorneys brings this Civil Action Complaint and avers as follows:

### INTRODUCTION

This case involves a school — entrusted with children of limited means and troubled backgrounds — that wrongfully and tragically served up one of its students for unwarranted blame for various crimes, after she resided there for three and one-half years without a hint of violence or destruction of property. Jaiden struggled with the disability of significant, but treatable, depression.

1

Employees of Defendant, The Milton Hershey School ("MHS"), willfully and knowingly misrepresented facts to police in a way that caused them to wrongly charge Jaiden with felony crimes, which a juvenile court judge dismissed before any defense was even offered.  After a prank fire alarm and suspected arson at Jaiden's student home — both of which had no connection whatsoever to Jaiden — MHS employees and administrators manufactured a "case" against Jaiden, played fast-and-free with the facts, and made it appear that Jaiden was the only suspect. This was in part due to intense personal animus towards Jaiden and her mother and in part to try to find any scapegoat at all, lest the "arson" be unsolved and reflect badly on MHS staff and administrators.

MHS's actions failed miserably to meet the most basic standards of care required for a residential school of MHS's nature.  MHS's animus toward Jaiden was evident when, four weeks prior to the apparent arson, MHS imposed severe disciplinary measures on Jaiden, merely for getting a small tattoo in a discreet location on her hip that was not visible to anyone.  Contrary to false assertions by her housemother, Kathy Akins, and Home Life Administrator, Kelley Rusenko, such tattoos were not prohibited by any MHS policy.  In fact, Housemother Akins recorded all tattoos for identification purposes, as if there was a useful security purpose. Nonetheless, Jaiden's tattoo "crime" led MHS to impose on her the most severe and draconian punishment allowed under the MHS Handbook short of termination.  This so-called "Level III" punishment included isolated detention, barring Jaiden from any communication with her mother, and even decreased food rations, deliberately seeking to humiliate a child who did what countless children her age do all the time.  "Level III" is reserved for acts of aggression or other such severe misconduct.  No student at MHS had ever previously faced such discipline over a tattoo.

Having thus insidiously "set up" this poor child with a deliberately provocative and gratuitously cruel punishment, MHS then used the completely predictable and emotional response from the ultrasensitive Jaiden to persuade the police that Jaiden was the only one with a "motive" and was taking "revenge" against MHS by committing arson.

In other words, MHS first humiliated a teenage girl with such ridiculous measures as total isolation and decreased food rations — over a non-issue (a tattoo!) — and then, when Jaiden reacted emotionally, MHS used those emotions as "evidence" to allege a major felony. Worst of all, MHS was so artful in its "explanation" that it duped the authorities, by lying to them, and thereby subjecting this girl to a surrealistic and Kafkaesque criminal trial ordeal.

Rather than seeking "vengeance" as MHS claimed, Jaiden had in fact fully resolved herself to abide by her unjust punishment, because, among other things, this was the only path to things like varsity field hockey, enjoying her sophomore year, and starting 10th Grade with a clean slate.

MHS terminated Jaiden's enrollment well before her criminal trial. The school is set up to a be a surrogate family for students, complete with group "homes" for living and "houseparents" who ostensibly care for the children. Thus, Jaiden's sudden separation from her group home familial unit, on account of the school's intentional and negligent actions to expel her after wrongfully accusing her of crimes for which there was no evidence whatsoever, led to wide-ranging and significant emotional and economic damages, as well as the loss of educational, athletic and scholarship opportunities.

Despite having the charges against her dismissed and otherwise found not to have committed the arson, Jaiden was still labeled in her public school community to which MHS terminated her as an arsonist, was unable to adjust, gained an unhealthy amount of weight

(requiring surgery to help correct), fell into depression, saw her grades drop, and otherwise suffered the loss of the enjoyment of all of her high school years.  Jaiden essentially became a recluse forced into home schooling without even so much as an apology from MHS for all they had put her through.  Capping matters, after Jaiden secured a job at the Hershey Lodge, controlled by the School Trust, and became one of the top servers at the Lodge, Jaiden was abruptly fired soon after engaging an attorney to request her school records.

## PARTIES

1.      Jaiden Buchan is now an adult female individual and is a citizen of the Commonwealth of Pennsylvania, currently residing at 345 W. Chocolate Avenue, Hershey, Pennsylvania  17033.

2.      Defendants, The Milton Hershey School and The Hershey Trust Company, refer to themselves collectively as the "Milton Hershey School and School Trust," which they describe as being an integrated tax-exempt organization composed of a not-for-profit corporation, acting as Manager under the Deed of Trust, and the Trust itself, filing one Federal Form 990 (hereinafter referred to as "MHS" or the "School" or the "School Trust" as the context implies) with its principal address at 711 Crest Lane, Hershey, Pennsylvania 17033, with registered agents authorized to receive service of process at that address. MHS is organized, exists and operates pursuant to and by virtue of the laws of the Commonwealth of Pennsylvania.

3.      With approximately $12.5 billion in assets, MHS is the world's wealthiest residential school, and serves children in grades K through 12.  According to the MHS website, the School provides a "cost-free, private, coeducational home and school for children from families of low income, limited resources, and social need. The School is funded by a trust established by Milton S. Hershey and his wife Catherine. Milton Hershey School offers a positive, structured home life year-round and an excellent pre-kindergarten through 12th grade education."

4.      The School Trust was and continues to be a charitable trust qualified under Section 501(c)(3) of the Internal Revenue Code of 1986 with its principal address at Hershey Trust Company, 100 Mansion East Road, P. O. Box 445, Hershey, Pennsylvania 17033.

5.      The School Trust is organized, exists and operates pursuant to and by virtue of the laws of the Commonwealth of Pennsylvania.  The School Trust's purpose is to maintain "a permanent institution for the residence and accommodation of poor children . . . and the maintenance, support, and education . . . of such children."

6.      The School Trust funds the School and owns a controlling interest in The Hershey Company, a publicly-traded corporation.

7.      The School Trust owns The Hershey Trust Company, which serves as its trustee.

8.      The School Trust wholly owns the Hershey Entertainment and Resorts Company ("HERCO"), which oversees resort properties, such as the Hershey Lodge, along with an amusement park called "Hersheypark."

9.      Defendant, The Hershey Trust Company (hereinafter the "Trustee") was and continues to be a Pennsylvania for-profit corporation, with its principal place of business located at 100 Mansion Road East, in Derry Township, Hershey, Pennsylvania 17033-0445.  The Hershey Trust Company is organized, exists, and operates pursuant to and by virtue of the laws of the Commonwealth of Pennsylvania.  The Trustee was organized for the purpose of serving as trustee of the School Trust and continues to serve in this role.  The Trustee is wholly owned by the Milton Hershey School.

10.     The School and the Trustee share a self-perpetuating, interlocking and integrated governance structure.  The members of the School's Board of Managers are the same persons as the members of the board of directors of the Trustee.  The School's Board of Managers and the

board of directors of the Trustee will be collectively referred to herein as the "Trust/School Boards."

11.     Defendants, John Does 1-10, is a moniker/fictitious name for individuals and entities currently unknown but will be substituted when known, as affiliated, associated or liable hereunder for the reasons set forth below or inferred therefrom. Each of these parties are incorporated as Defendants in each and every count and averment listed above and below. Upon information and belief, Defendants, John Does, were agents, servants, workmen, or employees of Co-Defendants, liable to Plaintiff hereunder. Upon information and belief, John Does are citizens of Pennsylvania.

12.     All named defendants will be collectively referred to herein as "Defendants."

13.     At all times relevant hereto, Defendants acted by and through their agents, servants and employees, each of whom acted within the scope of his or her job duties.

## JURISDICTION AND VENUE

14.     This Honorable Court has jurisdiction over this matter pursuant to 28 U.S. Code § 1331, 42 U.S.C. § 12182, et seq., and 42 U.S.C. § 3601, et seq., as this action seeks redress for violations of Jaiden's constitutional civil rights. In addition, this Honorable Court also has jurisdiction over the pendant state law tort claims pursuant to 18 U.S.C. § 1367.

15.     Venue appropriately lies in this District because Jaiden and the Defendants are residents of the Commonwealth of Pennsylvania and all of the acts complained of occurred within the Middle District of Pennsylvania.

## FACTS

### JAIDEN BUCHAN, A SENSITIVE AND TENDER CHILD

16.     Jaiden Buchan was born on January 4, 1997, and lives in Hershey, PA.

17.     Jaiden's mother is Kim Buchan ("Kim"), a hair-dresser with a business in Hershey, PA.

18.     Kim is on friendly terms with several individuals either employed by or closely associated with MHS.

19.     Among Kim's MHS-affiliated friends are current MHS president Peter Gurt ("Gurt").

20.     Kim was the frequent guest at drinking parties attended by Gurt and thrown by Gurt's brother, Bob Gurt.

21.     Bob Gurt is also close friends with senior MHS administrators, including Annette Cole-Gill, also a friend of Kim, and someone who attended the same drinking parties.

22.     MHS, now led by Gurt, is lax with houseparents with whom the Senior Administration has close contacts.

23.     For instance, one houseparent couple who were part of Gurt's drinking circle, and who should have been fired for earlier negligent conduct after they left a group of students waiting all night at a rendezvous point, eventually had a young graduate die in a young graduates' student home that they supervised.

24.     The girl in question in the latter incident had complained to the houseparents of illness and went to bed. No one ever checked on her — and five days later, she was found dead in her room, having passed away three days earlier.

25.     Although Jaiden was doing well at her public school, Hershey Middle School, and although Jaiden was very happy living in the warm home provided by her mother Kim, the Gurts persuaded Kim that Jaiden would be better off at MHS.

26.     Among other things, the Gurts told Kim that MHS would provide Jaiden with free and abundant activities. They also promised a very lucrative college scholarship, up to $80,000.  All of this misled Kim into believing that MHS would be a good move for Jaiden.

27.     Gurt then used his influence to steer Jaiden's MHS application in a favorable manner, even though it was clear that Jaiden was hardly the kind of "social orphan" that the school purports to serve.

28.     Nonetheless, Gurt's manner of operating MHS allows him to find an exception for a friend, such as Kim, even where that may not be in the best interests of a child.

29.     In other words, the "favor" that Gurt did for Kim in this instance was ill-conceived: Jaiden was doing just fine at home, but after the Gurt administration was done with her, they had ruined this poor child's life.

30.     Having thus obtained Gurt's "help" in clearing MHS enrollment hurdles, Jaiden was admitted to MHS on or about January 20, 2009, as a 6th Grader — a time when a child her age should have been home with her loving mother.

31.     Jaiden was admitted despite lacking the social need of most students at MHS, and despite having been doing well in the Derry Township School System, but only after Pete Gurt used his influence to have her admitted under her ordinarily non-qualifying circumstances.

32.     Jaiden was of course homesick for her single mother in Hershey, who was her sole adult support at home.

33.     Like many MHS children who are wrongly separated from loving parents, Jaiden was naturally anxious at MHS, and often called her mother crying.

34.     Nonetheless, again just as many other MHS children do, Jaiden adapted to her new environment and did her best to thrive.

35.     Jaiden became very active in MHS student government (including as president) and sports, and particularly excelled at field hockey, making varsity even as a freshman in 2011.

36.     But Jaiden was continuously homesick for her mother, who lives less than 2 miles from campus, and often cried about wanting to go home to her.

37.     MHS is particularly intent on weakening strong parental-child bonds, as evidenced from a glowing Patriot News article that described the emotional trauma of a 4-year-old girl, who had been wrested from the care of a loving and devoted mother, with an MHS administrator admonishing the mother, "Focus on your dreams and goals. Don't give in to the temporary pain and sadness!"

38.     MHS was aware of Jaiden's close relationship with her mother.

39.     Indeed, homesickness is extremely common at MHS, since many of the children there today do not even need residential care, but like Jaiden, are merely seeking MHS's material advantages.

40.     Kim's constant devotion to Jaiden came to be seen as a thorn in the side of the MHS Administration.

41.     Because Kim always came to Jaiden's aid, and pushed for Jaiden to be transferred to multiple student homes when Kim was dissatisfied with the houseparents, MHS Staff especially resented Kim for what they viewed as Kim using her "connections" with the Gurts to receive what Staff perceived as preferential treatment and transfers.

42.     In other words, MHS staff are accustomed to docile and impoverished parents of children who have very limited means, and who will tolerate virtually any condition or indignity imposed on them.

43.     When a mother — or a student — balks at mistreatment, or heaven forbid asks for a student home transfer, that mother or child will often be seen as a "troublemaker."

44.     When a child or parent is deemed a "troublemaker," MHS staff and administrators can be known to exact their vengeance, using their ability to isolate a child or threaten a child with expulsion to make the child's life unbearable.

45.     There are few children anywhere more powerless, defenseless, or vulnerable than those in an institutional setting, where adults can abet each other's targeting of children instead of protecting them, as has happened at MHS.

46.     The all too often abuses include threatening to jeopardize a child's precious "scholarship money" with discipline "points," thereby putting at risk perhaps the single biggest "motivator" that MHS uses to entice poor families to place their children at MHS, even when those children actually have no need whatsoever for placement in MHS's group home environments, and may in fact be permanently damaged by such.

47.     MHS punishment of "troublemakers" can at times border on Dickensian, with detentions and detention meals, that latter of which are decreased food rations that children are forced to eat in the presence of peers who enjoy normal rations; i.e., the effort of which is to batter the self-esteem of children who already suffer from inadequate self-worth.

48.     Where cutting a child's food or isolating them does not get MHS staff and administrators the "results" they seek, such adults are known to pursue other measures, including manufacturing and/or exaggerating grounds for expelling children.

49.     Countless children have been on the receiving end of an MHS railroad job that leads to their expulsion, as ultimately happened to Jaiden.  MHS has literally no checks in place to protect such children.

50.     Kelley Rusenko, the MHS Home Life Administrator for Jaiden, witnessed Jaiden's homesickness firsthand.  Rusenko also witnessed firsthand what MHS deemed "interference" by Kim, but that the normal world sees as a loving mother fighting for her child.

51.     Rusenko and Kathy Akins resented Jaiden's calls to her mother to intervene when issues arose, as MHS was not accustomed to "intrusion" into their policies, procedures, and conduct. They also disapproved of Jaiden spending so much time with her mother on weekends, with more relaxed rules than MHS, which the school thought detracted from MHS discipline.

52.     Jaiden's mother Kim was described in MHS records as being "uncooperative" and "difficult to work with," treating MHS as a "boarding school," and feeling that Jaiden is above the rules and regulations.

53.     Importantly, "boarding school" is precisely how MHS and Gurt marketed itself to Kim and others.

54.     Rusenko had earlier praised Jaiden's development and character when Kim sought a change in Jaiden's prior student home, after Kim expressed disapproval of the houseparents.  But Rusenko was also aware, according to MHS records, that Jaiden's sensitivity is such that one minor thing can really make her "implode."

55.     Jaiden was diagnosed at MHS with a depressive disorder, had early suicide ideation, and engaged in one or more acts of cutting herself, leading to her admission to the MHS Health Center for a multi-day stay with therapy.

56.     Jaiden came to feel that she did not belong at MHS, and felt guilty being there.

## PROBLEMS AT SILVERBROOK

57.     In February 2012, several girls in student home Silverbrook, where Jaiden resided, had written graffiti on the walls alleging inappropriate conduct by the housefather.  All of the

students were questioned and some girls were disciplined or terminated, but Jaiden was not among them.

58.     In fact, Rusenko wrote in her notes that Jaiden had been cleared as a result of handwriting exemplars.

59.     When Jaiden found a bomb threat note in the MHS girl's bathroom at the beginning of 9th Grade, and turned it over to the administration, she was questioned as a suspect, but cleared when it was determined that a boy had entered the same bathroom prior to Jaiden finding the note. Peter Gurt drove Jaiden back to her student home after the inquiry, aware that she was no longer a suspect.

60.     Mr. and Mrs. Akins, Jaiden's 9th and 10th Grade Houseparents at MHS, initially had good relationships with Jaiden.

61.     But things changed when Kathy Akins (and some of Jaiden's housemates) visited Jaiden off campus and saw that she lives in Hershey in a nice apartment.

62.     After the visit, Jaiden noticed a markedly different and adverse change in the manner in which Housemother Akins interacted with her, calling Jaiden spoiled and privileged, putting her down in front of her peers, and reducing her conduct grade from gold to brown for no given reason.

## TATOO-RELATED SEVERE AND UNJUST PUNISHMENT
## IS IMPOSED JUST TO UPSET JAIDEN, BUT SHE RISES ABOVE IT

63.     Housemother Akins became determined to find fault with Jaiden.  To this end, Akins began spying on Jaiden's every move, including on Facebook.

64.     It was obvious that Akins wanted something to hold over Jaiden's head or discipline her for after seeing Jaiden's warm home and meeting Kim.

65.     Bizarrely, Akins started following Kim on Facebook in the summer of 2012.

66.     Akins' meticulous surveillance finally paid off when she spotted on Facebook a picture of Jaiden at the beach in a bathing suit, showing a small tattoo on her hip.

67.     The tattoo said "LOVE" and Jaiden did not have it before.

68.     Akins knew it was new because she inventories all tattoos for ID purposes, and thus was also fully aware that other girls in the student home have tattoos like normal kids everywhere.

69.     It was at just this point that the MHS "perfect storm" of child mistreatment reared its head, with a spiteful housemother ready to pounce on her prey.

70.     Akins and Rusenko immediately seized the tattoo as an opportunity to shove Jaiden out the door, by torturing her emotionally, because both know Jaiden to be extremely sensitive and fragile, and knew that she would feel heightened pain at any mean and arbitrary treatment.

71.     In other words, the cagey veteran housemother Akins and administrator Rusenko knew the MHS "methods" and set out to play emotional control cat and mouse with a child who was at their mercy, and who would no doubt call her mother to withdraw her from MHS.

72.     Akins set her plan in motion by blowing the incident out of proportion and  reporting Jaiden to Rusenko for a "tattoo violation."

73.     To support any punishment, Akins and Rusenko would have to claim that the tattoo was an MHS "Student Handbook" violation, in classic MHS make-things-up manner.

74.     In fact, the MHS Student Handbook makes no mention of tattoos and many kids have several. Nonetheless, Rusenko and Akins irrationally, abusively, vindictively, and cruelly imposed on Jaiden a "Level III" infraction for the tattoo, a very severe level of offense at MHS that carries 15 demerit points and a long two week detention.

75.     These types of detentions have far-reaching consequences and become part of a student's permanent record — which is why a serious offense is required before they can be imposed. Imposing them for a hidden, small tattoo was unprecedented.

76.     These were also Jaiden's first serious "points" during her entire time at MHS, and entailed 2 weeks of student home detention on campus, 20 extra hours of chores, and "detention meals" (an appallingly backward practice of punishing children by denying them the same quality of food that other children receive).

77.     "Level III" is defined in the Handbook as "student misbehavior that has not responded to either Level I or II interventions/consequences, results in serious acts of aggression to self or others, destruction of property, or behaviors which pose a direct threat to the safety of other students or adults in the School."

78.     By no measure did an innocuous tattoo fit this description.

79.     Level III is for very serious offenses, not make-believe Handbook violations.  Despite protestations of unfairness by Jaiden, Mrs. Akins and Rusenko did not relent.

80.     Importantly, for children in an institutionalized setting such as MHS, isolation from loved ones, the lack of child advocates, and complete vulnerability to arbitrary and wrongful abuse compound the pain that any child such as Jaiden would feel in such circumstances.

81.     Just as Rusenko and Housemother Akins had hoped, Jaiden reacted with deep pain and anguish to their intentional provocation, suffered an emotional meltdown, slammed doors, and complained about the injustice when many of the other girls also had tattoos, which these heartless manipulators fully expected.  This was the "implosion" that Rusenko had earlier predicted.

82.     It is a matter of course that teenagers often complain when properly disciplined. But when they are subjected to grossly improper discipline, by adults with complete control over them, and they know they are being targeted, the result is psychic wounding.

83.     Rusenko and Housemother Akins perfectly predicted poor Jaiden's reaction, hoping it would lead to Jaiden's voluntary departure from MHS, or to Kim's withdrawing Jaiden, and thereby letting Rusenko and Akins rid themselves of Jaiden and her mother once and for all.

84.     Rusenko and Housemother Akins in particular knew that their cruel and unjust punishment would seriously wound Jaiden, as it would require two weeks on campus in the summer when she would otherwise be able to spend that time with her mother, whom she missed immensely, or two weeks detention during the school year, which would prevent her from making the field hockey team.

85.     In other words, this cruel pair confronted a vulnerable child with a horrible "Sophie's choice"— her mother's love or her cherished sport.

86.     Jaiden wanted to leave MHS when this punishment was imposed.  But she calmed down after the field hockey coach and her mother came to talk her into staying.

87.     Thereafter, Jaiden committed her final "crime" by upending Rusenko and Akins' plan; i.e., Jaiden served out her detention at MHS without incident. She also finished her 20 hours of assigned chores earlier than expected and thereby earned an early release from the detention.

88.     Even if Jaiden could have been construed to have disobeyed a no-tattoo edict, it would still constitute no worse than a Level I violation ("failure to follow student home or classroom rules"), not an extreme Level III infraction. But a student like Jaiden had no recourse other than to accept it, as MHS allows for no appeal, review for abuses, or any other check on malicious

adult conduct. On the contrary, the adults close ranks and let children bear the brunt of improper decisions.

89.     Because scholarship money is also lost if a child gets more than 50 points in a school year, Jaiden used her summer vacation to serve the 2-week detention at MHS that goes with a Level III, missing precious summer vacation time with her mother in order to begin her 10th Grade school year with a clean slate and the incident fully behind her.

90.     If Jaiden had served detention during the new school year, she would have missed out on a chance to make varsity field hockey, as one is barred from participation in all activities and privileges while on detention.

91.     Jaiden's actions in clearing her way for field hockey and 10th Grade showed her commitment to staying at MHS and that even arbitrary abuse would not drive her away.  Little did Jaiden know the lengths to which Rusenko and Akins would be willing to go.

92.     When the new 2012-2013 school year started on or about August 2, 2012, Jaiden made the varsity field hockey team and was excited.  This was another step in the opportunity for a sports scholarship and schools like Rutgers University began showing interest.  MHS even sent Jaiden to field hockey camps sponsored by universities.

93.     Jaiden had no discipline incidents when she came back for school, after serving detention and then being home with her mother after that.

94.     Everything was finally going Jaiden's way and she was ready for a breakout field hockey season. Then disaster struck for Jaiden – but it spelled opportunity for the relentless Rusenko and Akins.

**THE UNSOLVED FIRE ALARM PRANK**

95.    On August 8, 2012, a fire alarm was pulled by someone in Jaiden's student home basement at 7:34 a.m.. But Jaiden had been upstairs at the time and so had nothing to do with it, as another girl in the home confirmed.

96.    But having been targeted by Rusenko and Akins already, Jaiden's instincts told her to beware of again being scapegoated.  Sure enough, that is what would happen when MHS would soon pile up charges against her.

97.    One girl who had been in the basement bathroom at the time publicly admitted  to the prank.   However, MHS investigators, including Rusenko, conveniently convinced the girl to withdraw her admission.

98.    A second girl then admitted that she too had participated in the prank — but again, the MHS staff persuaded her to recant, as Rusenko and Akins were adamant on directing suspicion at Jaiden.

99.    A third possible suspect was the 11-year old grandson of the houseparents, who was also in the basement on the morning of the prank and may have participated.  But he too was simply excluded as a suspect, as Housemother Akins dismissed the girl's concerns about him.

100.    The fourth possible suspect was a girl who withdrew from MHS on the very morning of the prank at just around the time of the alarm.

101.    But no one was ultimately accused and the lack of solid evidence was underscored when MHS chose to impose collective punishment on the entire student home, thus deeming every girl a suspect, and no single girl the likely perpetrator.

102.    Later that evening, the girls in the student home had casual conversations amongst themselves in the student home van, being driven by Mrs. Akins, who is also hard of hearing and has to read lips.

103.    Upon seeing an ambulance drive past, one girl asked Mrs. Akins if an ambulance had ever had to be called to a student home and the housemother responded that one had been called several years back, over a grease fire in the kitchen of a home that Mrs. Akins supervised.

104.    One of the girls asked how a grease fire could start and the girls essentially participated in related banter, with recollections later unclear as to who said what when.

**GREASE FIRE GIVES RUSENKO AND AKINS ANOTHER SHOT AT JAIDEN**

105.    After the conversation in the van, Mrs. Akins negligently left a pot of grease on the stove of the student home kitchen, which pot had by then been sitting there for four days. Mrs. Akins claimed this was because she did not know how to dispose of grease, despite her having previously faced a grease fire as an MHS houseparent and thus certainly knew the dangers of failing to properly discard it.

106.    The pot would catch fire the next morning and a fire alarm sounded at 4:45 a.m..

107.    Panic ensued as Akins yelled down the hallway where the girls were sleeping "It's a real fire!" In the hubbub, others also yelled and matters became confused, as the girls hastened to seek safety.

108.    Jaiden was among the girls who would have heard Akins' scream and also repeated it; i.e., the girls were trying to make sure that everyone knew this was not a drill, and everyone got out safely.

109.    The girls were quickly questioned by the police and fire authorities and Rusenko, but there was no way to determine who was responsible.

110.    But one immediately obvious suspect was none other than Akins' own 32-year-old son, who was the last person awake in the student home before the fire was set, having returned to the student home in the early morning hours.

111.    To this day, no one knows what Andrew Akins condition was on the night of the fire — besides his having taken opioids — and whether he himself set it by accident, in a sleepy stupor.

112.    Among the reasons that Andrew Akins' conduct was never fully explored is that Mr. and Mrs. Akins secreted him off the premises immediately, recognizing that his presence might lead to larger problems than even their friend Pete Gurt could solve. This is because Andrew should not have even been at the student home that night, or any other night, in light of his record and background.

113.    At the time of the fire, Andrew Akins had been arrested 3 times. His arrest record included violating a protection from abuse order, an assault, and impersonating an officer and harassment. In fact, shortly after the fire, his arrest record grew, as he was arrested on other charges too.

114.    At the time of the fire, Andrew Akins' criminal record meant he was not supposed to even set foot on the MHS campus, let alone have access to a student home full of teenage girls in the middle of the night.

115.    But with the fire came the police, the fire department, terrified children, worried parents, and lots of questions, including why someone with Andrew's record was in the student home at all — a problem that would flow back to MHS president Peter Gurt, because of his close relationship with the Akins

116.    Gurt's ties to the Akins go back some 30 years, to Gurt's own time at MHS as a student, when Mr. Akins parents were in fact Gurt's own houseparents. This led to the young Gurt and

the then young Mr. Akins forming a close friendship that carries forward to this day, and helps explain why the Akins were indulged on Andrews' presence at the student home at all, despite his criminal record. Gurt was even known to stop by the student home himself and deliver steaks to the Akins, as gifts.

117.    In other words, Gurt's cosseting of another of his houseparent cronies had to be concealed at all costs. The Akins thus needed a scapegoat, and fast, and they and Rusenko knew just where to turn: their favorite target, Jaiden Buchan.

118.    Rusenko and the Akins determined quickly to offer up Jaiden as the culprit and sole target of the investigation, wanting someone to blame besides themselves or Andrew, especially since this was the second grease fire to occur under the Akins' watch. In no event would MHS allow an "unsolved" crime that would draw attention to Andrew Akins.

119.    Thus, Rusenko and the Akins' pointed the investigators immediately to Jaiden (and only Jaiden) as the one child with whom they had a problem, and therefore was the prime suspect.

120.    Incredibly, Rusenko and the Akins cited Jaiden's reaction to the unjust punishment/tattoo incident of several weeks earlier as "grounds" for this.

121.    Rusenko and Akins began flatly lying to the police. For instance, they told investigators that the tattoo implosion incident has occurred a week earlier, when it was in fact several weeks earlier. They also conveniently omitted the exemplary manner in which Jaiden had served detention thereafter, earned an early release from it, and bounced back to channel her energies into field hockey.

122.    They also failed to inform investigators that Jaiden served the detention prior to the school year, to preserve a clean 10th Grade conduct record.

123.    Straining themselves to cast Jaiden in a bad light, Rusenko and the Akins also told the investigators that Jaiden was guilty of a "theft," to wit, an 8th Grade 5-girl late night raid on the pantry for a snack).

124.    Rusenko and the Akins also claimed that Jaiden was a suspect in a bomb threat, another flat-out lie since she had been expressly cleared in the matter.

125.    They also lied and told investigators that Jaiden was a suspect in the graffiti incident (for which she had been fully cleared by a handwriting exemplar.)

126.    Most damning and untruthful of all, they claimed that Jaiden was a suspect in the fire alarm prank (for which no one had ever been accused).

127.    There was never any doubt about who MHS would have take the fall in an environment where there are literally no checks on adult conduct like this, no one was looking out for the interests of a child like Jaiden, who could get railroaded at MHS without a shred of accountability.

128.    By the time Rusenko and the Akins were done poisoning the well with investigators and predisposing the authorities to zero in on Jaiden, deftly concealing Andrew Akins whereabouts and history, the investigators would have been justified in suspecting Jaiden in whatever crime had been committed where she was in the vicinity.

129.    Never did MHS mention to investigators that Jaiden had been fully cleared of two of these incidents, and not yet accused of the fire alarm until the grease fire, when MHS ex post facto lodged the fresh accusation timed just when it would be most damaging, defamatory, and utterly misleading to officials dealing with a fire.

130.    Jaiden was thus naturally viewed by the police as a delinquent and someone capable of arson, and the only one with a motive.

131.   But at least 5 other girls from the student home had far more disciplinary infractions, from fighting and bullying to cheating and lying to damaging property and threatening to shoot the housemother in the face (which led to a termination recommendation) and other delinquent behavior, all of which was held back from the authorities by Rusenko and the Akins, all infinitely more serious and relevant to the arson investigation than Jaiden's temper tantrum from wrongful detention.

132.   After perfunctory questioning of most of the other girls, Jaiden was among the last to be questioned by the police, the fire marshal and Rusenko on the morning of the fire. By then, Rusenko and Akins had fully predisposed the investigators to assume Jaiden's guilt. In fact, even the questioning of the other girls had dealt largely with Jaiden's conduct, thus starting a "Jaiden-is-guilty!" sentiment even among the other girls, in classic witch hunt manner.

133.   This was not based on any evidence at all but instead because the houseparents and Rusenko had falsely identified Jaiden as the most problematic child and had even ascribed to her a bogus motive, based primarily on the tattoo incident with such absurdity as homesickness and a desire to leave MHS tossed in.

134.   Even though none of this held water, the "interview" started off in an aggressive and accusatory manner, with the finger pointed squarely at Jaiden, using information supplied in advance by the houseparents and Rusenko; e.g., "You really didn't like it here, did you?"  "You were pretty upset about your punishment for your tattoo, weren't you?"  "Would you rather be at home with your mom?"  "Do you really like field hockey?"  And "[if you admit it,] you can be home with your mom."  "We know you did it.  Just admit it and it will be fine."   Outrageously, MHS offered Jaiden no assistance during this inquisition, one which no other person faced, not even Andrew Akins who actually had a criminal record.

135.    Jaiden was even accused of "not being committed to MHS" as possible "grounds," despite being the Middle School Student Government President, a member of the Varsity field hockey team, and participating in other clubs and activities, all of which Rusenko and the Akins also held back from the investigators as they insidiously stacked the deck against this child.

136.    In other words, rather than providing the investigators with a full portrait of a student leader, star athlete, and resilient child who was locked in on her sophomore year and field hockey season, Rusenko and the Akins jumped on the scale to cast Jaiden in the worst possible light and in essence sic the investigators on her, which was manifested in an ugly and aggressive round of questioning.

137.    Jaiden naturally denied any role in starting the fire and reacted to the accusations by asking for her mother, as any child would. But this perfectly normal request was greeted with the absurd charge that, "Only guilty people ask for their mothers." From that point, Jaiden was identified as the arsonist, without further investigation of any other person in the house, including Andrew Akins, who had actually fled the scene before the authorities arrived.

138.    Importantly, MHS has a history of undue influence on the local police; e.g., in the notorious Charles Koons case, the Derry Township Police "lost" a file about a child molester who had abused numerous MHS children. The file included a sworn affidavit by the mother of one of Koons' victims. But Koons got off scot-free and continued to molest children in the area until being caught, ten years later, by police in a neighboring town. MHS is also the most powerful local employer, taxpayer, and distributor of lucrative contracts—and the Derry Township Police know this.

139.    Koons had also been the son of a substitute houseparent, and used his access to MHS kids to abuse them. This history heightened MHS fears that another houseparent's son — closely

associated with the school president himself, Peter Gurt — might be implicated, further fueling the witch-hunt against Jaiden.

140.    In short, MHS desperately needed a culprit and pressured and steered the police to arrest Jaiden.

141.    MHS also unsuccessfully sought to have Jaiden immediately detained in a juvenile offender facility, in an effort to close down further inquiry and prevent suspicion from falling where it belonged; i.e., on the son of houseparents intimately connected to Gurt.

142.    Thus, within hours of the fire, Jaiden became the only suspect to the exclusion of far more likely suspects, including other girls in the student home and the houseparents' own son Andrew.

143.    As invariably happens when MHS staff gang up on a poor child, others joined in. In this case, MHS Home Life Director Tim Wasielewski piled on, by emailing the police ostensibly incriminating evidence against Jaiden that was anything but incriminating, such as (i) Jaiden has a Facebook account which they were told was shut down but it was not; (ii) Jaiden told the girls she kept her cell phone with her because she was afraid something bad was going to happen; (iii) Jaiden was overhead telling her mother she was going to be blamed for the false alarm; and (iv) Jaiden smirked in the Health Center when asked why she was screaming at 2:00 a.m. the night after the fire, with an MHS psychologist incorrectly stating she had no history of night screaming.

144.    MHS was not about to let the focus turn to the houseparents who left the grease on the stove for four nights. Nor did MHS want attention directed at their son, with a criminal record, who should not have been on the premises unsupervised in the middle of the night, but who had free rein to return home late that night after being out on the town while everyone else was

sleeping. Andrew then fled the scene before investigators arrived, at the urging of his parents, as he had no permission to be in the girls' student home at all.

145.    Instead, it was imperative for every adult involved to work together to shift all suspicion to a teenage girl who would then either be convicted or acquitted at trial, long after the houseparents had been eased into another role and their son Andrew's behavior forgotten.

146.    Even Andrew Akins piled on Jaiden when finally interviewed, with a fantastical story that the night after the fire alarm, he pretended to have a fingerprint kit and told the girls he would fingerprint the fire alarm to see who did it and Jaiden acted concerned.

147.    Even after police notified MHS that they obtained a fingerprint from the grease pot that did not match Jaiden, MHS did not ask whether others should be fingerprinted and left all fingers pointed at Jaiden, lest the real culprit be identified and MHS be proven wrong.

### THE CHARGE, THE ACQUITTAL AND MHS'S DEPLORABLE CONDUCT

148.    On this flimsy record, and with MHS pushing Jaiden's guilt, Jaiden was criminally prosecuted for five felonies related to the fire and the earlier fire alarm, as an add-on, with Rusenko going so far as to lie and tell police what MHS itself deemed an unsolved prank was in fact that work of Jaiden.

149.    With this type of flagrant untruth, and with the omission of such things as Jaiden being a student leader and star athlete, the only offense in this matter that can be proved with any certainty is that of MHS making false statements to the police.

150.    As a matter of course, despite Rusenko and the Akins best efforts to frame Jaiden, once a juvenile court judge had an opportunity to review the School's actual evidence dispassionately, and reject all of the bogus evidence, the court dismissed the case in its entirety. The court did this before Jaiden had even presented her defense, so flimsy was the prosecution's entire case.

151.    But Rusenko and Akins had managed to achieve one of their goals: they now had Jaiden out of the school, once and for all.

152.    Jaiden had been immediately suspended on August 9, 2012 and was soon thereafter expelled. She received no apology nor the courtesy of any type of MHS communication after the May 2013 trial, and acquittal of all charges.

153.    On the contrary, the children of MHS employees who knew of the matter, despite Jaiden's acquittal, made sure to spread word of it at Hershey High — the local public school to which Jaiden returned upon being removed from MHS only to be greeted with taunts about being a pyromaniac and other humiliation.

154.    Just when Jaiden was becoming better adjusted to MHS and had created meaningful bonds, MHS falsely accused her of arson, terminated her enrollment, ruptured her social bonds with friends, houseparents, teachers, coaches, counselors, and other staff, destroyed the MHS home that she had come to accept, took away her entire support structure, banished her from MHS, stigmatized and marginalized her at her new school, humiliated her, and otherwise acted in total disregard of her well-being, all with completely predictable adverse results.

155.    The litany of MHS falsehoods and egregious evidence withholding is startling.

156.    For instance, one piece of evidence pushed by MHS was that Jaiden may have been the first to scream and yell fire, even though she could not actually see the fire. But MHS knew that Mrs. Akins — just as she was compelled to testify when placed under oath — had herself yelled fire down the girls' hallway and that Jaiden could easily have heard that and reacted precisely as expected to a frightening 4:45 a.m. fire alarm. But Mrs. Akins failed to advise police of this fact during the initial investigation, persuading the police to believe that Jaiden knew about the fire

before anyone else, "because she started it." The entire trial — and Jaiden's very expulsion — would have been avoided but for this glaring omission.

157.    Neither Rusenko nor anyone else spoke up for Jaiden, nor gave her a shred of support, during the fire investigation. MHS also withheld exculpatory information from the police, happy to see Jaiden as the accused, particularly the houseparents, where blame on Jaiden also deflected blame from them, their son, and in the case of the prank alarm, their grandson.

158.    MHS's sham investigation followed a basic pattern: everyone's statements were taken at face value, except Jaiden's, when in fact any of the girls could have equally been suspects while one or more could have been lying to cover their involvement.

159.    One girl had no roommate, and Jaiden's roommate, a light sleeper, did not awaken when Jaiden supposedly left the room to start the fire, even though a sensor would have lit up the room if Jaiden had left it to commit arson.  MHS ignored this fact too and failed to report it to the investigators as well.

160.    While letting police believe that Jaiden did not take her sleep aid medications the night before the fire, her housemate Crystal corroborated Jaiden's story of taking that medication the night before the fire.

161.    Crystal also stated that at 4:23 a.m. she heard something like "a slap or smack."  She stated she was scared to move, had no roommate, went back to sleep, and then alarm went off.

162.    While Crystal admitted to being awake at 4:23 a.m., MHS used as a piece of incriminating evidence against Jaiden that she admitted waking at around 4:30 a.m.

163.     On the basis of nothing more than vague suspicions, blatantly wrong conjectures, and a farcical "investigation" fueled by ill-will, Jaiden was put on a leave of absence, ostensibly pending an MHS investigation.

164.    But in fact, Jaiden was simply terminated in November 2012 by MHS, which acted as judge, jury and executioner. This was even before the trial took place, rather than granting Jaiden leave of absence status until after the matter was resolved. There was never any doubt about Rusenko and Akins' ultimate goal: remove Jaiden.

165.    For instance, Jaiden's housemate (Miss EP) gave a written statement to MHS on August 10, 2012, when she wrote that Jaiden had a feeling "that something would happen like Mrs. Akins would come down the hall so she slept with her phone in her bra." In other words, like virtually every other child with a phone that she wasn't supposed to have, Jaiden took precautions to conceal it, in the event the houseparent showed up suddenly. This was a far cry from what MHS conveyed to the police; i.e., that Jaiden slept with her phone that night because she thought something like a fire would happen. Jaiden slept with her phone in her bra so it would not be confiscated, not because she was planning arson (and was suddenly so inept that she told a student, "I'm keeping my phone in my bra tonight because I'm going to set the house on fire"). Any scrutiny showed how contrived the new testimony had become.

166.    There was also an internal MHS memo, addressed to Kelley Rusenko, Michael Grimm, and Tim Wasielewksi, that apparently was not handed over to the police, and that raised grave suspicion about student AB. The memo noted that the houseparents at student home Trailways, on the day of the fire, thought that AB's behavior was "very off", and AB acted differently during the day, sitting away from the rest of the girls at the Health Center, and stayed distant when Mrs. Akins came by. "Something seems very off about her disposition to us."

167.    Rick Gilbert, Director of Safety at MHS, sent a shocking memo on August 10, 2012 (just one day after the fire) to Peter Gurt, Tim Wasielewski, Kelley Rusenko, and others asserting that Fire Investigator Dennis Woodring "feels as though she [Jaiden] is the offender based on how

she answered and acted throughout the line of questioning." Thus, MHS's finger was squarely pointed at Jaiden, without a shred of evidence — and pointed away from others, despite a comparative mountain of evidence.

168.    Although no one had been identified as the culprit in the prank alarm on August 8, 2012, Kelley Rusenko nonetheless wrote an ex post facto report, dated August 13, 2012, concluding that Jaiden was responsible for the prank alarm and should get a Level IV violation for it.

169.    But in Phil Grimm's August 8, 2012 9:03 a.m. report, he wrote that no one admitted the pull, but noted that Crystal said she did it, and when further questioned, said she did not. Thus, no suspect was identified. Grimm's supplemental report, on August 13, 2012, now states Jaiden "appeared very upset.  She looked like she was going to cry."  But this was after Grimm said the children would not have any privileges until Rusenko followed up. He reports the Crystal admission and does not accuse Jaiden.

170.    Rusenko prepared a supplemental report addressing the whereabouts of Jaiden's housemate LD, who, according to the report, "was signed out by her sponsor at 7:30 a.m. She was already off campus with the intention of withdrawing when the fire alarm station was activated at 7:34 a.m. on that same day."  Incredibly, despite the proximity in time of her exit and the prank alarm, MHS excluded her as a suspect and withheld all of this information from the police too, not advising police of the girl's whereabouts.

171.    Tim Wasielewski completed a September 14, 2012 report in which he changes all of the facts and this time has Kathy Akins stating that Jaiden asked all the questions in the van about the ambulance and fire. Walielewski did so even though it is irrefutable that a number of girls asked questions about the grease fire from years earlier, all of which sounded like normal conversation. But Wasielewski's false report was placed into Jaiden's records. Even Mrs. Akins

testified that she could not identify voices well, but this too was withheld from the police during the investigation.

172.    Raising the stakes for Jaiden's mother, Kim Buchan, MHS threatened her with a $700,000 restitution claim soon after the fire. MHS did this knowing she had no assets and that the loss was covered by insurance. The goal was to coerce a confession and punish Kim for her "interference."

173.    Mrs. Akins' animus is further evidenced from Police Detective Melhorn's report of 11:40 a.m. on August 27, 2012, when Kathy Akins came to the police station requesting information to make sure the charges stuck to Jaiden.  While she first says she blames herself, her bias and character assassination of Jaiden was fully revealed when discussing the tattoo incident, as Melhorn's report notes: "Kim was outraged according to Kathy that she Jaiden was turned in. Kathy explained that was her job and Kim has a habit of doing whatever it takes to get Jaiden out of trouble.  Kathy said every time Jaiden would get in trouble, she would call her mom and pitch a fit, cry and flail her arms around to Kim and Kim would relent and stick up for Jaiden."

174.    Vice-President Gurt would have sided with the Akins in any dispute against Jaiden, because of his long-term friendship with them, which was well-known.  After the incident, they got a paid leave of absence and no discipline despite the grease left on the stove and having Andrew in a house full of high school age girls, without permission.

175.    In an effort to kick Jaiden while she was down, MHS even refused to return Jaiden's personal possessions after the fire, including her new iPod touch, $300-$400 of new clothes, a new Adidas bag, and all her other possessions, saying these were discarded after the fire. But there was only smoke damage to the items and other students got their possessions back along with new clothes and $1,000 to cover any damages from the fire.

176.    Here too, MHS has a history of humiliating expelled students by throwing away their possessions, including cherished awards, in total disregard of children's wellbeing.

177.    MHS's absurd rationale for persecuting Jaiden in the absence of a shred of credible evidence was that "she did not want to be at MHS," a preposterous and illogical position because even were it true, she would have taken responsibility for the prank alarm or the fire in order to get kicked out, instead of being terrified when the incident occurred and then devastated at being blamed.

178.    MHS failed to take any of the reasonable measures that would have been expected of it, whether assistance with transitioning, counseling, or, most important of all, an invitation to return to the school once Jaiden had been fully cleared.

179.    The presiding trial judge made a finding that Jaiden did not commit the acts for which she had been framed and went so far as to rule before the defense had even called a single witness, so legally baseless was the entire farcical case.  At times during the trial, the judge rolled his eyes at the "testimony" of the girls, visibly discomfited at the nature of the proceeding.

180.    Having conspired to see that Jaiden was falsely charged, and after willfully withholding key evidence from the police/fire departments that would have exculpated Jaiden and pointed a finger at others, the school then allowed Jaiden's reputation to be completely sullied, by ordering that Jaiden's expulsion would stand as though she were in fact guilty.

181.    The rumor-mill would continue to haunt Jaiden at Hershey High (where Jaiden tried to return after being expelled from MHS).  This forced Jaiden to withdraw in shame from Hershey High School too, and then complete her high school education at home, stripped of her dignity, community, access to sports and other extracurricular activities, turning her into a recluse in a manner that devastated her adolescent soul.

182.    MHS' conduct in effect turned Jaiden into a complete pariah, even though the school had an affirmative obligation to repair the damage — reputational and otherwise — that it caused once this child was exonerated.

183.    Instead, MHS, Gurt, Rusenko, and the houseparents simply sat back and watched as Jaiden's entire childhood and much of her future went up in flames, all as part of a cover-up of their own negligence, simply so that they could avoid admitting that they had accused the wrong person.

184.    Rusenko had even helped the police try to duplicate the noise that Crystal said awoke her at 4:23 a.m., by opening and closing Jaiden's room door, despite knowing that doors are not permitted to be closed and failing to advise police of that critical fact that made the entire test absurd.

185.    The facts now demonstrate that in addition to the negligence shown in caring for Jaiden, MHS protected the houseparents, the houseparent's opioid-using/criminal record son (who came home late in the middle of that very night), the houseparent's grandson, and all of the other girls, but threw Jaiden under the bus and offered her no similar protection of any kind.

186.    The combination of seeking to shield the conduct of Andrew and finding some convenient scapegoat led to the following negligent acts towards Jaiden, which fell below the standard of care required of an institution like MHS, with full custody, care, and control of a child, and led to a rush to blame and judgment:

(a)    Failure to enforce student home rules regarding unapproved or unlawful invitees in a girls' student home;

      (b)     Failure to supervise houseparents who were intimate friends with a senior administrator and whose conduct in regard to the grease pot, and the impermissible trespasser, was negligent;

      (c)     Failure to provide advisory support and understanding to Jaiden, who they treated as a guilty party despite the lack of evidence;

      (d)     Failure to advocate on behalf of Jaiden when the evidence was so concocted and flimsy;

      (e)     Forcing a student to stand alone and defend herself in the face of a witch-hunt partly intended to cover up the wrongdoing of employees and senior administrators;

      (f)     Failure to prevent the houseparents and Home Life Administrator Rusenko from pointing a finger solely at Jaiden, in obvious retaliation for a recent temper tantrum by Jaiden and other animus toward Jaiden and her mother;

      (g)     Failure to supervise Home Life Administrator Rusenko and the houseparents despite their history of acrimony towards Jaiden, and have an independent trained investigator take over the matter from them;

      (h)     Withholding evidence from the police of Jaiden's MHS leadership record, athletic successes, improved attitude since serving her detention and other exculpatory evidence, along with evidence of the violent and aggressive records of other girls near the time of the fire, all of which would have made clear that Jaiden was among the least likely suspects and placed suspicion where it belonged, on others, or if unproven on no one;

      (i)     Failure to have in place policies that put children first and protect them from arbitrary or vindictive acts by administrators or staff;

(j)     Fostering a culture of adult vindictiveness towards children and failing to put in place even the most basic checks on staff abuses of authority towards targeted children; and

(k)     Failure to act in an unbiased and neutral manner during and after the fire investigation, rather than actively pursuing Jaiden as an arsonist from the outset and the only person with a supposed motive.

### THE SPECIAL, CUSTODIAL RELATIONSHIP EXISTING BETWEEN THE DEFENDANTS AND STUDENTS ENROLLED AT THE SCHOOL

187.    MHS is a private residential school for children in financial and social need from pre-kindergarten through 12th grade.  It cares for many children who face severe financial and social needs.

188.    MHS currently enrolls approximately 2,000 students and solicits applications for admission from children between the ages of 4 and 15.

189.    The School spends approximately $100,000 per year per enrolled student.   MHS also provides for up to approximately $80,000 in higher education benefits to each qualifying graduate.

190.    According to the School, its students live "in large, comfortable homes with 10 to 14 students in their own age group.  A pair of married houseparents oversee each home, providing the structure that children need and taking an active interest in their development."

191.    The School also advertises to prospective students and their parents or guardians that MHS "aims to create a family-like atmosphere for students" with houseparents and other students becoming a student's "extended family."

192.   MHS promotional materials represent that, "[o]ur students live at the School and our program is year-round.  So the Student home and houseparents are at the core of each child's stability and safety while they are here" (emphasis added).

193.   Indeed, MHS openly describes itself as "a private residential school with surrogate parenting responsibilities."

194.   In court documents recently filed by MHS in the Eastern District of Pennsylvania (Mother Smith v. MHS), MHS further described the special type of custodial relationship between the School and its students as follows:

> The Milton Hershey School educates children in a unique, home-like environment. … the School is designed and operated to raise and care for children, and to fulfill a parental role for most of the year.
>
> * * *
>
> [T]he School operates a home-like residential setting in conjunction with its educational program that is a fundamental part of its program.  Students reside at the school 24 hours a day, 7 days a week, for most of the year, living in family style residences. … students often also reside at the School for most of the year, not just during the school year.

*See* p. 2 and 6-7 of Milton Hershey School's Answer with Affirmative Defenses to Amended Complaint and Counter-Claim for Declaratory Judgment in *Mother Smith* (E.D. Pa. 11-cv-07391 at Dkt. #10), a true and correct copy of which is attached hereto as Exhibit "B."

195.   Elsewhere in the same filing, MHS explained the broad scope of primary and physical custodial control it exercises over its enrolled students by virtue of its status as the students' primary caregiver, as follows:

> [T]he School provides a unique all-encompassing program for these children, including an education, housing in a family setting, food, clothing, medical, dental and psychological care, and recreational opportunities, with no financial obligation to the family.

*Id*. at 17.

196.    Also in those documents, MHS refers to the "comprehensive nature of the care provided by the School" to students and touts "the unique 24/7 residential nature of its programs and services" as well as its "unique residential private school setting" that includes "a very closely-knit community" with an "extended [school] year."  Id. at 3, 21 and 23.

197.    In connection with a settlement reached in the above-noted Mother Smith case, MHS confirmed that "it stands 'in loco parentis' to all children attending the School" See ¶ 19 of the ADA Settlement Agreement discussed in more detail below (emphasis added).

198.    The breadth of MHS's custody over students extends to controlling both parental visitation schedules at the School and so-called "overnight" visits taken by students, which are often visits between the students and their natural parents and/or guardians.

199.    Indeed, MHS's desire to affirmatively undertake its surrogate family role is so pronounced that it prohibits parent-child interaction during the first month that a child is enrolled in MHS, even for children as young as four, working to create a new dynamic.

200.    The School monitors and regulates every aspect of children's lives, creating a virtual surrogate institutional family.  MHS even regulates the love lives of its students, and requires, among other things, that "Students must be at least 15 years of age and in Senior Division to begin dating," and that "[d]ating arrangement must be set up with and approved by houseparents."

201.    These and other  MHS practices illustrate that MHS is deliberate in its effort to substitute its student home/MHS "school family" for the biological families of enrolled students, thereby heightening its own duties to these children, in good times and bad.

202.   Any subsequent removal from MHS is the equivalent of removal from a child's natural family, with traumatic consequences greater even in many cases than the original traumatization of entering MHS.

203.   MHS has developed a non-discrimination and equal opportunity policy entitled "Milton Hershey School (MHS) Student, Applicant and General Public Non-Discrimination and Equal Opportunity Policy," Policy No. 2.05.1, effective date December 4, 2012 (the "Equal Opportunity Policy").  A true and correct copy of the Equal Opportunity Policy is attached hereto as Exhibit "D."

204.   The Equal Opportunity Policy includes the following "Policy Statement":

> Milton Hershey School ("MHS" or the "School") will not tolerate any form of harassment or discrimination on the basis of race, color, religion, sex, disability or need for accommodation, association with or relationship to person with a disability, or any other class or status protected under federal, Pennsylvania, or local law (collectively "Protected Characteristics"), against any applicant for admission, enrolled student, or any other individual(s) who participate(s) in the programs, services, and activities of the School. … Individuals protected by this policy, other than applicants and students, would include parent/sponsors and visitors touring the School or attending public events.

> * * *

> This Equal Opportunity Policy ("EO Policy" or "Policy") prohibits all forms of discrimination in all programs, services and activities of the School, including, but not limited to, admissions, academic and educational programs, other terms, conditions or privileges of education or enrollment at the School, and all activities open to the general public.

*Id.* at 1.

205.   The Equal Opportunity Policy goes on, in a section entitled "Disability Discrimination is Prohibited," to mandate the following protections for students enrolled at the School:

> The School is committed to preventing discrimination against persons with disabilities, and complying with the federal

Americans with Disabilities Act ("ADA") and all similar Pennsylvania and local laws … . All applicants for admission and currently enrolled students with disabilities … will have an equal opportunity to participate in and benefit from all goods, services, facilities, privileges, advantages, accommodations, or programs provided by or at MHS.

\* \* \*

The School will not exclude persons with disabilities … from participation in, or deny them the benefits of, the full and equal enjoyment of its goods, services, facilities, privileges, advantages or accommodations on the basis of their disability.

\* \* \*

***Applicants who are otherwise qualified for admission to the School will not*** be denied enrollment or ***have their enrollment discontinued solely on the basis of their disability***.

\* \* \*

Applicants and students with disabilities … have an equal opportunity to participate in or benefit from the goods, services, facilities, privileges, advantages, and accommodations provided by the School.

\* \* \*

The School will make reasonable modifications to its policies, practices, and procedures when the modifications are necessary to afford goods, services, programs, facilities, privileges, advantages, or accommodations to all individuals with disabilities.

*Id*. at 2-3 (emphasis added.)

206.    Pursuant to the ADA, the term "disability" means: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment."   42 U.S.C. § 12102(a).

207.    The ADA defines "mental impairment" to include "[a]ny mental or psychological disorder, such as … emotional or mental illness."  28 C.F.R. § 36.104.

208.    Further, it is well-established that emotional conditions such as anxiety and depression are disabilities included within the meaning of "disability" under the ADA.

209.    However, despite the clear requirements of MHS's own Equal Opportunity Policy designed to prevent future instances of discrimination, upon information and belief, Defendants refused to implement or inadequately implemented, among things, (1) safeguards to prevent discrimination against students suffering from emotional or mental illnesses, including anxiety and depression; or (2) any type of reasonable modifications to afford goods, services, programs, facilities, privileges, advantages, or accommodations to students suffering from emotional or mental illnesses, including anxiety and depression.

210.    Despite the promises made and stated intentions of the School, the Defendants have failed to follow their own directives when caring for Jaiden, who MHS knew suffered from a serious but treatable form of depression, resulting in acts of discrimination against Jaiden on account of her disability.

211.    It is believed that a so-called "Enrollment Review" of Jaiden was conducted prior to her expulsion.

212.    An MHS "Enrollment Review" is a misnomer.  Specifically, it never deals with enrollment, but instead, it is only used to pursue expulsions; i.e., when MHS is getting ready to send a child away, the administrators circle up in a proceeding that they euphemistically call an "Enrollment Review."

213.    MHS children are not permitted to attend, speak at, or be represented at their Enrollment Reviews.  Parents and guardians are similarly excluded.  There are no means of providing evidence, arguments, or pleas on behalf of children who are subjected to these sham proceedings. Thus, there is no due process of any kind.

214.    MHS makes no account of the proceeding to provide to students or their guardians, and there is no right of appeal whatsoever.

215.    In sum, the entire Enrollment Review proceeding, with its near-inevitable result in most cases, is itself an affront to child welfare, due process and ADA norms.

216.    Before being expelled from MHS, Jaiden had planned to go to a University like Rutgers with the scholarship money provided to students who successfully graduated from the School.

217.    Specifically, students enrolled at MHS are eligible to receive up to $80,000 in post-secondary scholarships, earning credits for each year successfully completed at the School, substantially as follows: 5% for freshman year, 15% sophomore, 30% junior and 50% senior year.  However, students expelled from the School prior to graduating – like Jaiden – are not eligible to receive any of this scholarship money.  This was a major inducement in Jaiden's mother enrolling her at the behest of the Gurts.

218.    Without access to any scholarship money, Jaiden has had to support herself and has been unable to afford and attend college full-time at the same time, emotionally scarred from her treatment by MHS.

219.    MHS heightened Jaiden's alienation, loneliness, and break with the community where she finally felt she belonged (MHS), and made her feel her future would be hopeless without MHS.

220.    While MHS's conduct toward Jaiden shocks the conscience, it is not an isolated incident in the mental health policies of MHS, where one administrator or houseparent is able to focus on the child being terminated.

221.    Jaiden was recently terminated from employment at the Hershey Lodge, controlled by the Hershey Trust, despite being one of its top servers, on another make-believe charge without witnesses or damages, in retaliation for her engaging an attorney to request her MHS records.

**COUNT I**
**VIOLATION OF THE AMERICANS WITH DISABILITIES ACT**
*Plaintiff v. All Defendants*

222.    Plaintiff incorporates by reference all of the preceding paragraphs of this Complaint as if each was individually set forth at length within this Count.

223.    Jaiden met all of MHS's eligibility criteria during his enrollment at the School.

224.    MHS discriminated against Jaiden by terminating her from MHS on the basis of a perceived mental disability that would cause her to set fire to her own student home.

225.    The Defendants failed to investigate, engage in an interactive dialog with, and/or offer any reasonable accommodations to Jaiden for her mental disability, which reasonable accommodations would have allowed her to remain enrolled in and prosper at MHS after her acquittal.

226.    Jaiden did not pose a direct threat to anyone such that the Defendants' conduct was permissible under the ADA. Moreover, the Defendants have never indicated when, how, and to whom Jaiden posed such a direct threat, having failed to make any individualized assessment based on reasonable judgment, relying on current medical knowledge, or on the best available objective evidence.

227.    The Defendants had no medical, scientific or rational basis to exclude Jaiden from participating in or benefiting from the goods, services, facilities, privileges, advantages and accommodations provided by the School, particularly after a judge found that she did not commit the acts of which she was accused.

228. Rather than relying on current medical knowledge or the best available evidence about adolescent depression or consulting with trained professionals at MHS, the Defendants based their decisions on unfounded accusations and assumptions, unwarranted fears, generalizations, prejudices, stereotypes and myths about mental and emotional illnesses.

229. The Defendants denied Jaiden the right to participate in and benefit from the goods, services, facilities, privileges, advantages and accommodations provided by the School based on her depression, anxiety and other mental and emotional illnesses.

230. Title III of the Americans with Disabilities Act prohibits discrimination against individuals on the basis of disability in the full and equal enjoyment of the services of any place of public accommodation. 42 U.S.C. § 12182, et seq.; 28 C.F.R. § 36.102, et seq.

231. At all relevant times, Jaiden had a mental impairment (diagnosed mental and emotional illness) or perceived impairment that substantially limited the operation of her major bodily functions, as well as substantially limited other major life activities, such that she was an individual with a disability within the meaning of the ADA.

232. In addition, Jaiden's medical records all note a diagnosis of the mental impairment of depressive disorder, such that they reflect that she was an individual with a disability within the meaning of the ADA.

233. Finally, the Defendants regarded Jaiden as an individual with a disability within the meaning of the ADA.

234. MHS is place of public accommodation within the meaning of the ADA because it is an "elementary, secondary … private school or other place of education." 42 U.S.C. § 12181(7)(J).

235.    As described above, Defendants denied Jaiden the full and equal enjoyment of the goods,

services, facilities, privileges, advantages and/or accommodations provided by MHS on the basis

of his disability in violation of 42 U.S.C. § 12182(a) and 28 C.F.R. § 36.201(a).

236.    Through its actions, Defendant also:

> (a)    Denied Jaiden the opportunity to "participate in or benefit from the goods, services, facilities, privileges, advantages or accommodations" of MHS, in violation of 42 U.S.C. § 12182(b)(1)(A)(i) and 28 C.F.R. § 36.202(a);
>
> (b)    Utilized "standards or criteria or methods of administration that have the effect of discriminating on the basis of disability," in violation of 42 U.S.C. § 12182(b)(1)(D) and 28 C.F.R. § 36.204;
>
> (c)    Imposed or applied eligibility criteria that "screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying its goods, services, facilities, privileges, advantages or accommodations," in violation of 42 U.S.C. § 12182(b)(2)(A)(i); and
>
> (d)    Afforded Jaiden with an unequal benefit in regard to its offering of goods, services, facilities, privileges, advantages or accommodations on the basis of her disability, in violation of 42 U.S.C. § 12182(b)(1)(A)(ii) and 28 C.F.R. § 36.202(b).

237.    Defendants' discrimination was a direct and factual cause that led Jaiden to sustain severe

emotional and psychological harm.

238.    Plaintiff seeks immediate injunctive relief, which shall consist of (a) immediate

qualification for the MHS Scholarship program as if she had completed her sophomore, junior

and senior year at MHS, and had met all criteria upon graduation, and access to whatever other

assistance, rights and privileges the School provides to its graduates; (b) creation by MHS of a

therapeutic student home for the seriously depressed children in its care, with 24 hour

professional coverage; (c) appointment of an advocate for children to participate in all

enrollment reviews; and (d) a commitment to continue care for children suffering from a mental

health disability for a duration of at least twelve (12) months from diagnosis before any decisions on termination are made.

239.    Plaintiff also seeks the recovery of attorney's fees, litigation expenses and costs consistent with 42 U.S.C. § 12205 and 28 CFR § 36.505.

**COUNT II**
**VIOLATION OF THE FAIR HOUSING ACT**
*Plaintiff v. All Defendants*

240.    Plaintiff incorporates by reference all of the preceding paragraphs of this Complaint as if each was individually set forth at length within this Count.

241.    Jaiden met all of MHS's eligibility criteria during her enrollment to reside at the School.

242.    MHS discriminated against Jaiden by denying her housing at MHS on the basis of her mental handicap.

243.    The Defendants failed to investigate, engage in an interactive dialog with, and/or offer any reasonable accommodations to Jaiden for her mental disability, which reasonable accommodations would have allowed her to remain enrolled in and prosper at MHS.

244.    Jaiden did not pose a direct threat to anyone such that the Defendants' conduct would be permissible under the FHA.  Moreover, the Defendants have never indicated when, how and to whom Jaiden posed such a direct threat, having failed to make any individualized assessment based on reasonable judgment, relying on current medical knowledge, or on the best available objective evidence.

245.    The Defendants denied Jaiden continued residence at the School, the right to participate in and benefit from the residential programs at the School, and the right to other goods, services, facilities, privileges, advantages and accommodations provided by the School based on his depression, anxiety and other mental and emotional illnesses.

246.    At all relevant times, Jaiden had a mental impairment (diagnosed mental and emotional illnesses) that substantially limited the operation of his major bodily functions, as well as substantially limited other major life activities, such that he was an individual with a handicap within the meaning of the FHA, 42 U.S.C. § 3602(h).

247.    In addition, Jaiden's medical records all note a diagnosis of a mental impairment, such that they reflect that he was an individual with a handicap within the meaning of the FHA.

248.    Finally, the Defendants regarded Jaiden as an individual with a handicap within the meaning of the FHA.

249.    Jaiden is an aggrieved person as defined by the FHA, 42 U.S.C. § 3602(i)(1), and has suffered damages as a result of the Defendants' discriminatory conduct as described above.

250.    Defendants' discrimination was a direct and factual cause that led Jaiden to sustain severe emotional and psychological harm and humiliation.

251.    Jaiden's student home at MHS is a dwelling, as set forth in the FHA, 42 U.S.C. § 3602(b).

252.    Jaiden, like all students enrolled at MHS and living in the student homes on campus, were given chores and other tasks to do by their houseparents.  Theses chores and tasks were required, and constitute consideration for Jaiden's residence in the student home.

253.    Additional consideration for Jaiden's residence in the student home was provided to the School by The Milton Hershey School Trust, which contributed money, funding and other tangible consideration.

254.    As described above, Defendants have:

> (a)    Discriminated against Jaiden in the sale or rental, or otherwise making unavailable or denying a dwelling to Jaiden because of her disability, in violation of the FHA, 42 U.S.C. § 3604(f)(1);

(b)    Discriminated against Jaiden in the terms, conditions, or privileges of rental of a dwelling or in the provision of services or facilities in connection with a dwelling, because of her disabilities, in violation of the FHA, 42 U.S.C. § 3604(f)(2);

(c)    Refused to make reasonable accommodations in their rules, policies, practices or services, when such accommodations were necessary to afford Jaiden equal opportunity to use and enjoy her dwelling, in violation of the FHA, 42 U.S.C. § 3604(f)(3); and

(d)    Afforded Jaiden with an unequal benefit in regard to its offering of goods, services, facilities, privileges, advantages or accommodations on the basis of her disability, in violation of 42 U.S.C. § 12182(b)(1)(A)(ii) and 28 C.F.R. § 36.202(b).

255.    Plaintiff seeks immediate injunctive relief which shall consist of, inter alia, (a) immediate qualification for the MHS Scholarship program as if he had completed her high school years at MHS, and had met all criteria upon graduation, and access to whatever other assistance, rights and privileges the School provides to its graduates; (b) creation by MHS of a therapeutic student home for the seriously depressed children in its care, with 24 hour professional coverage; (c) appointment of an advocate for children to participate in all enrollment reviews; and (d) a commitment to continue care for children suffering from a mental health disability for a duration of at least twelve (12) months from diagnosis before any decisions on termination are made

256.    The discriminatory actions of the Defendants were intentional, willful, and taken in disregard of Jaiden's federally protected rights.

257.    Plaintiff also seeks the recovery of money damages, attorney's fees, litigation expenses and costs consistent with the FHA.

## COUNT III
## NEGLIGENCE – BREACH OF DUTY OF CARE
### *Plaintiff v. All Defendants*

258.    Plaintiff incorporates by reference all of the preceding paragraphs of this Complaint as if each was individually set forth at length within this Count.

259.   An affirmative duty on the Defendants' part to care for Jaiden and protect her from harm arose from the special relationship that existed between Defendants and Jaiden.

260.   Specifically, and as described at length above, through its "unique, home-like environment," the Defendants, by and through their agents, servants and employees, exercised custody and control over its enrolled students, such as Jaiden.   At all relevant times, MHS functioned as Jaiden's primary caregiver, providing education, housing, food, clothing and medical, dental and psychological care.   In these and other ways, Jaiden was dependent on the Defendants to meet his basic needs of sustenance, care and protection.   Moreover, the Defendants had imposed limitations on Jaiden's freedom to act on his own behalf and had deprived Jaiden of his normal opportunities for protection.

261.   For all of these reasons, the Defendants owed Jaiden a special and higher duty of care, in addition to a duty of ordinary care, to protect her from harm, and not to single her out for blame, creating a personal life-altering catastrophe  that placed her freedom at risk.

262.   As noted herein the Defendants, by and through their agents, servants and employees, breached the duty arising by virtue of their special relationship with Jaiden in ways which include, but are not limited to, the following:

(a)   By failing to act in the child's best interest and assume an *in loco parentis* role as to the events surrounding the fire;

(b)   By failing to protect the child from employees who resented Jaiden and her mother and vindictively pointed blame at her because of a recent meltdown over an unjust and harsh punishment for a tattoo;

(c)   By failing to appoint outside, unbiased, unconflicted counsel or investigators to assure that the school's agents do not steer an investigation in a way that will

help the school shift responsibility to innocent students and away from itself or the houseparent's family members;

(d)     By failing to provide support, advocacy, and counseling to any child affected by the event, regardless of whether they are viewed as suspects, witnesses, or otherwise;

(e)     By failing to closely examine the conduct of an employee's illegal invitee (in this case, the houseparent's son, Andrew);

(f)     By failing to prohibit the school's agents and employees from making blatant retaliatory efforts to cast suspicion in the eyes of the police and fire departments on a child where such efforts are as transparent as falsely reporting to the police/fire departments that the child was a thief and a "suspect" in a bomb threat, a "suspect" in a graffiti incident, and  a "suspect" in a false fire alarm incident, and then compounding this insidious line of false accusation by casting the child as somehow being a "malcontent," desirous of "finding a way out of the school," or otherwise worthy of suspicion;

(i)     By failing to disclose to fire/police department investigators that a senior administrator (VP Pete Gurt) was intimate friends of the houseparents and very desirous of protecting them, including their son Andrew; and

(j)     By elevating the houseparents' interests, and the school's own interests, above the interests of a child, biasing an investigation and willfully withholding from investigators evidence that was essential to any credible assessment of the facts.

263.    Defendants had a further duty to protect Jaiden because MHS took charge of Jaiden, who was helpless to adequately aid or protect herself, but then discontinued its aid and protection, thereby leaving Jaiden in a far worse position than when MHS took charge of Jaiden in the first place.

264.    Jaiden was significantly damaged by all of these breaches by the Defendants, mentally, emotionally, physically and monetarily.

265.    As a result of the above-described conduct, Jaiden suffered significant mental, emotional and physical harm, including, but not limited to, severe mental anguish, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life as well as conscious pain and suffering; and/or Jaiden has been denied at least $300,000 worth of education at MHS and over $80,000 of post-secondary education benefits.

266.    All of these damages were foreseeable to the Defendants because at the time of each breach described above, the Defendants knew or should have known that remaining in the supportive environment of MHS was essential for Jaiden's well-being given her then-existing fragile mental state.

267.    The aforementioned conduct by Defendants was negligent, careless, intentional, reckless, willful and malicious such that punitive damages are further warranted.

**COUNT IV**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
*Plaintiff v. All Defendants*

268.    Plaintiff incorporates by reference all of the preceding paragraphs of this Complaint as if each was individually set forth at length within this Count.

269.    By acting in conscious disregard of the standard of love required of an institution such as MHS and in conscious disregard of the anti-discrimination requirements set forth in both the Equal Opportunity Policy and the ADA, Defendants did by extreme and outrageous conduct intentionally or recklessly cause severe emotional distress and bodily harm to Jaiden.

270.    Defendants acted extremely and outrageously in singling out Jaiden for punishment regarding the tattoo, and as the sole suspect and perpetrator of arson at the student home,

misrepresenting and omitting material facts, and expelling Jaiden partially on the basis of her perceived mental impairments at the very time when she was the most fragile, despite the fact that Defendants purportedly provided a vast array of psychological and psychiatric services, including, but not limited to, crisis intervention.

271.   Defendants' conduct intentionally and/or recklessly caused Jaiden severe physical and emotional distress, including severe mental anguish and horror, because the natural and probable consequences of Jaiden's proposed expulsion from the School was Jaiden's emotional distress.

**COUNT V**
**NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**
***Plaintiff v. All Defendants***

272.   Plaintiff incorporates by reference all of the preceding paragraphs of this Complaint as if each was individually set forth at length within this Count.

273.   If the acts described in Count IV are not deemed intentional, then they constitute negligent care below the standard required on an institution like MHS, and Defendants, by and through their agents, servants and employees, knew or reasonably should have known of the unwarranted exhibited distress that would be carried to Jaiden by them singling her out as the sole arson suspect with any evidence to support such claims and without providing exculpation information to the investigating authorities.

274.   Defendants, by and through their agents, servants and employees, knew or reasonably should have known that Jaiden was being discriminated against by virtue of the School's custom, practice or policy requiring the expulsion of students suffering with serious mental impairments or perceived impairments.

275.   Defendants breached the duty of care owed to Jaiden by failing to protect her from foreseeable pain and suffering related to her expulsion from MHS.

276.   Defendants' conduct resulted in Jaiden suffering severe physical and emotional distress, including severe mental anguish and horror, facing multiple felonies on account of this conduct.

### COUNT VI
### BREACH OF THE FIDUCIARY DUTIES OF CARE AND GOOD FAITH
*Plaintiff v. All Defendants*

277.   Plaintiff incorporates by reference all of the preceding paragraphs of this Complaint as if each was individually set forth at length within this Count.

278.   Defendants owed Jaiden fiduciary duties of care and good faith to provide a safe environment for all children in their care, requiring them to exercise the kind of reasonable inquiry, skill and diligence that a person of ordinary prudence would use in overseeing the care of young at-risk children and protecting them from known dangers.

279.   Officers and key employees of Defendants also have a fiduciary relationship with the School and School Trust which requires that they act in good faith with regard to the School and School Trust's best interests, and also requires that they apply the highest moral, legal, and ethical standards in their conduct.

280.   Defendants breached their duties by: (a) failing to hire qualified senior MHS administrators, and (b) failing to implement policies or institutional controls that would prevent incidents of discrimination against disabled students or vendettas against "problem" children and allow identification of such abuse once it had occurred.

281.   Based on Jaiden's documented history of mental impairment, it was reasonably foreseeable and, indeed, completely predictable, that if Defendants did not adequately exercise or provide the duty of care owed to Jaiden she would be vulnerable to emotional, mental and physical harm.

282.    The aforementioned conduct by Defendants was negligent, careless, intentional, reckless, willful and malicious, and as to the Trustee, constituted a breach of trust, such that punitive damages are further warranted.

283.    The above-described conduct directly caused Jaiden significant mental, emotional and physical harm, including, but not limited to, severe mental anguish, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life, conscious pain and suffering, and has denied Jaiden at least $300,000 worth of education at MHS and over $80,000 of post-secondary education benefits.

## COUNT VII
## NEGLIGENCE *PER SE*
### *Plaintiff v. All Defendants*

284.    Plaintiff incorporates by reference all of the preceding paragraphs of this Complaint as if each was individually set forth at length within this Count.

285.    Defendants have violated the ADA and the FHA.

286.    The purpose of these statutes, at least in part, is to protect the interest of the Plaintiff individually, as he is an intended beneficiary of both statutes.

287.    The aforementioned statutes clearly apply to the conduct of the Defendants in this case.

288.     As described above, the Defendants have violated these statutes, which is negligence per se.

289.    The violation of these statutes has proximately cause Jaiden's injuries.  Specifically, the above-described conduct directly caused Jaiden significant mental, emotional, physical and monetary harm, including, but not limited to, severe mental anguish, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life, conscious pain and suffering, and has denied Jaiden at least $300,000 worth of education at MHS and over $80,000 of post-secondary education benefits.

## COUNT VIII
## Malicious Prosecution
### *Plaintiff v. All Defendants*

290.    Plaintiff incorporates by reference all of the preceding paragraphs of this Complaint as if each was individually set forth at length within this Count.

291.    Defendants, and as described at length above, intentionally and maliciously pursued criminal charges against Jaiden, including, but not limited to, making blatant retaliatory efforts to cast suspicion in the eyes of the police and fire departments on a child where such efforts are as transparent as falsely reporting to the police/fire departments that the child was a thief and a "suspect" in a bomb threat, a "suspect" in a graffiti incident, and  a "suspect" in a false fire alarm incident, and then compounding this insidious line of false accusation by casting the child as somehow being a "malcontent," desirous of "finding a way out of the school," or otherwise worthy of suspicion.

292.    At all material times, Plaintiff had not committed any infraction to legally justify the Defendants' actions; i.e. Defendants never had any legally-justifiable cause to cast suspicion onto Jaiden.

293.    As a direct result of Defendants' actions, Jaiden was criminally prosecuted for five felonies related to the fire and the earlier fire alarm.

294.    However, the presiding trial judge made a finding that Jaiden did not commit the acts for which she had been framed and went so far as to rule before the defense had even called a single witness, so legally baseless was the entire farcical case. Thus, the criminal action was dismissed in favor of Jaiden.

295.    As a result of the above-described conduct, Jaiden suffered significant mental, emotional and physical harm, including, but not limited to, severe mental anguish, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace,

humiliation, and loss of enjoyment of life as well as conscious pain and suffering; and/or Jaiden has been denied at least $300,000 worth of education at MHS and over $80,000 of post-secondary education benefits.

296.   The aforementioned conduct by Defendants was negligent, careless, intentional, reckless, willful and malicious such that punitive damages are further warranted.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff requests the following relief:

  (a) Compensatory and actual damages in an amount to be determined at trial;

  (b) Punitive damages in an amount to be determined at trial;

  (c) Cost and reasonable attorneys' fees; and

  (d) Such other and further relief as this Court deems just and proper.

    Respectfully submitted,

    **WEISBERG LAW**

Date: December 28, 2016   */s/ Matthew B. Weisberg*
        Matthew B. Weisberg, Esquire
        L. Anthony DiJiacomo, III, Esquire
        7 S. Morton Avenue
        Morton, PA 19070
        (610) 690-0801
        MWeisberg@WeisbergLawOffices.com
        ADiJiacomo@WeisbergLawOffices.com

JS 44 (Rev. 12/12)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

JAIDEN BUCHAN

### DEFENDANTS

THE MILTON HERSHEY SCHOOL, ET AL.

**(b)** County of Residence of First Listed Plaintiff   Dauphin County
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Dauphin County
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Matthew B. Weisberg, Esquire
Weisberg Law, 7 South Morton Avenue, Morton, PA 19070
mweisberg@weisberglawoffices.com   (610) 690-0801

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ❏ 1   U.S. Government Plaintiff
- ❏ 2   U.S. Government Defendant
- ☒ 3   Federal Question *(U.S. Government Not a Party)*
- ❏ 4   Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                                  *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ❏ 1 | ❏ 1 | Incorporated *or* Principal Place of Business In This State | ❏ 4 | ❏ 4 |
| Citizen of Another State | ❏ 2 | ❏ 2 | Incorporated *and* Principal Place of Business In Another State | ❏ 5 | ❏ 5 |
| Citizen or Subject of a Foreign Country | ❏ 3 | ❏ 3 | Foreign Nation | ❏ 6 | ❏ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ❏ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ❏ 625 Drug Related Seizure of Property 21 USC 881 | ❏ 422 Appeal 28 USC 158 | ❏ 375 False Claims Act |
| ❏ 120 Marine | ❏ 310 Airplane | ❏ 365 Personal Injury - Product Liability | ❏ 690 Other | ❏ 423 Withdrawal 28 USC 157 | ❏ 400 State Reapportionment |
| ❏ 130 Miller Act | ❏ 315 Airplane Product Liability | ❏ 367 Health Care/ | | | ❏ 410 Antitrust |
| ❏ 140 Negotiable Instrument | ❏ 320 Assault, Libel & Slander | Pharmaceutical Personal Injury | | **PROPERTY RIGHTS** | ❏ 430 Banks and Banking |
| ❏ 150 Recovery of Overpayment & Enforcement of Judgment | ❏ 330 Federal Employers' Liability | Product Liability | | ❏ 820 Copyrights | ❏ 450 Commerce |
| ❏ 151 Medicare Act | ❏ 340 Marine | ❏ 368 Asbestos Personal Injury Product Liability | | ❏ 830 Patent | ❏ 460 Deportation |
| ❏ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ❏ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ❏ 840 Trademark | ❏ 470 Racketeer Influenced and Corrupt Organizations |
| ❏ 153 Recovery of Overpayment of Veteran's Benefits | ❏ 350 Motor Vehicle | ❏ 370 Other Fraud | ❏ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ❏ 480 Consumer Credit |
| ❏ 160 Stockholders' Suits | ❏ 355 Motor Vehicle Product Liability | ❏ 371 Truth in Lending | ❏ 720 Labor/Management Relations | ❏ 861 HIA (1395ff) | ❏ 490 Cable/Sat TV |
| ❏ 190 Other Contract | ❏ 360 Other Personal Injury | ❏ 380 Other Personal Property Damage | ❏ 740 Railway Labor Act | ❏ 862 Black Lung (923) | ❏ 850 Securities/Commodities/ Exchange |
| ❏ 195 Contract Product Liability | ❏ 362 Personal Injury - Medical Malpractice | ❏ 385 Property Damage Product Liability | ❏ 751 Family and Medical Leave Act | ❏ 863 DIWC/DIWW (405(g)) | ❏ 890 Other Statutory Actions |
| ❏ 196 Franchise | | | ❏ 790 Other Labor Litigation | ❏ 864 SSID Title XVI | ❏ 891 Agricultural Acts |
| | | | ❏ 791 Employee Retirement Income Security Act | ❏ 865 RSI (405(g)) | ❏ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | | ❏ 895 Freedom of Information Act |
| ❏ 210 Land Condemnation | ❏ 440 Other Civil Rights | **Habeas Corpus:** | | **FEDERAL TAX SUITS** | ❏ 896 Arbitration |
| ❏ 220 Foreclosure | ❏ 441 Voting | ❏ 463 Alien Detainee | | ❏ 870 Taxes (U.S. Plaintiff or Defendant) | ❏ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ❏ 230 Rent Lease & Ejectment | ❏ 442 Employment | ❏ 510 Motions to Vacate Sentence | | ❏ 871 IRS—Third Party 26 USC 7609 | ❏ 950 Constitutionality of State Statutes |
| ❏ 240 Torts to Land | ❏ 443 Housing/ Accommodations | ❏ 530 General | | | |
| ❏ 245 Tort Product Liability | ☒ 445 Amer. w/Disabilities - Employment | ❏ 535 Death Penalty | **IMMIGRATION** | | |
| ❏ 290 All Other Real Property | ☒ 446 Amer. w/Disabilities - Other | **Other:** | ❏ 462 Naturalization Application | | |
| | ❏ 448 Education | ❏ 540 Mandamus & Other | ❏ 465 Other Immigration Actions | | |
| | | ❏ 550 Civil Rights | | | |
| | | ❏ 555 Prison Condition | | | |
| | | ❏ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1   Original Proceeding
- ❏ 2   Removed from State Court
- ❏ 3   Remanded from Appellate Court
- ❏ 4   Reinstated or Reopened
- ❏ 5   Transferred from Another District *(specify)*
- ❏ 6   Multidistrict Litigation

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
42 U.S.C. § 12182, et seq.

Brief description of cause:
Americans with Disabilities Act, Fair Housing Act, Negligence

## VII. REQUESTED IN COMPLAINT:

❏ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $ *Will supply*

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ❏ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____   DOCKET NUMBER _____

DATE 12/28/16

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____